IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DARLENE EVELYN SALAZAR,

      Plaintiff,

      vs.                                  Civ. No. 24-600 MLG/JFR

MARTIN O'MALLEY, Commissioner,
Social Security Administration,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 13)[2] filed September 5, 2024, in connection with Plaintiff's *Opposed Motion to Reverse or Remand,* filed October 9, 2024.  Doc. 15.  On November 7, 2024, Defendant filed a Response.  Doc. 16.  On December 18, 2024, Plaintiff filed a Reply.  Doc. 19.  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds that Plaintiff's Motion is not well-taken and recommends that it be **DENIED**.

## I.  Background and Procedural Record

Plaintiff Darlene Evelyn Salazar ("Ms. Salazar") alleges that she became disabled on November 8, 2019, at the age of fifty-five years and seven months, because of fibromyalgia,

---

[1] On February 12, 2025, United States District Judge Matthew L. Garcia entered an Order of Reference referring this case to the undersigned to conduct hearings, if warranted, including evidentiary hearings and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.  Doc. 21.

[2] Hereinafter, the Court's citations to Administrative Record (Doc.13), which is before the Court as a transcript of the administrative proceedings, are designated as "Tr."

nausea, thyroid disorder, kidney disease, migraines, pain in legs/feet, chronic pain syndrome, pain in neck, and tendonitis.  Tr. 294.  Ms. Salazar completed one year of college and has worked as a retail cashier and apartment complex leasing specialist and agent.  Tr. 295, 302-09.  Ms. Salazar stopped working on November 8, 2019, because of her medical conditions.  Tr. 294.

On March 13, 2020, Ms. Salazar filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq.*  Tr. 248-57.  On August 19, 2020, she filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.*  Tr. 258-64.  On April 21, 2021, both applications were denied.  Tr. 73, 74, 75-82, 83-90, 133-36, 143-47.  On January 11, 2023, Ms. Salazar's applications were denied at reconsideration.  Tr. 110-28, 129, 130, 91-109, 158-62.  Ms. Salazar requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 24, 2023.  Tr. 46-72, 176-77  Ms. Salazar appeared before ALJ Jennifer Fellabaum with attorney representative Michelle Baca.[3]  *Id.*  On November 15, 2023, ALJ Fellabaum issued an unfavorable decision.  Tr. 26-39.  On April 19, 2024, the Appeals Council issued its decision denying Ms. Salazar's request for review and upholding the ALJ's final decision.  Tr. 1-6.  On June 13, 2024, Ms. Salazar timely filed a Complaint seeking judicial review of the Commissioner's final decision.  Doc. 1.

## II.  Applicable Law

### A.    Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

---

[3] Ms. Salazar is represented in these proceedings by Attorney Benjamin Decker.  Doc. 1.

of not less than 12 months".  42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance

benefits); *see also* 42 U.S.C. § 1382(a)(3)(A) (pertaining to supplemental security income

disability benefits for adult individuals).  The Social Security Commissioner has adopted the

familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria

as follows:

> (1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[4]  If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

> (2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

> (3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

> (4) If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work.  Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands.  A claimant who is capable of returning to past relevant work is not disabled.

> (5) If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  If the Commissioner is unable to make that

---

[4] Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a).  "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. §§ 404.1572(b).

> showing, the claimant is deemed disabled. If, however, the Commissioner is
> able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); *Fischer-Ross v. Barnhart*, 431

F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The

claimant has the initial burden of establishing a disability in the first four steps of this analysis.

*Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n.5, 96 L.Ed.2d 119 (1987).

The burden shifts to the Commissioner at step five to show that the claimant is capable of

performing work in the national economy.  *Id.*  A finding that the claimant is disabled or not

disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v.*

*Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

### B.    Standard of Review

The Court reviews the Commissioner's decision to determine whether the factual

findings are supported by substantial evidence in the record and whether the correct legal

standards were applied.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir.

2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).  A decision is based on

substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might

accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  A decision "is not

based on substantial evidence if it is overwhelmed by other evidence in the record[,]"  *Langley,*

373 F.3d at 1118, or if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371,

1374 (10th Cir. 1992).  Therefore, although an ALJ is not required to discuss every piece of

evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the

[ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient

particularity."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Further, the decision

must "provide this court with a sufficient basis to determine that appropriate legal principles

have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).  In undertaking

its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the

agency.  *Langley*, 373 F.3d at 1118.

## III.  <u>Analysis</u>

The ALJ determined that Ms. Salazar met the insured status requirements of the Social

Security Act through December 31, 2024, and that she had not engaged in substantial gainful

activity since her alleged onset date.  Tr. 31.  She found that Ms. Salazar had severe impairments

of

> left shoulder degenerative joint disease; as of February 2021, she also had bilateral
> knee and feet osteoarthritis, right plantar fasciitis, and neuroma; and as of August
> 2022, she also had left de Quervains tenosynovitis.

Tr. 31.  The ALJ found that Ms. Salazar's gout, headaches, gastritis, diverticulosis, GERD,

tonsillitis, hepatic steatosis, rib fracture, and right toe fracture were not severe.  Tr. 32.  The ALJ

further found that

> Fibromyalgia (SSR 12-2p), seronegative arthritis, and chronic pain syndrome are
> not medically determinable impairments as there is no objective medical basis for
> these[] diagnoses.  The claimant's fibromyalgia fails to satisfy the standards of
> either the 1990 or the 2010 American College of Rheumatology requirements
> because the record does not reflect tenderness of at least 11 tender points or
> tenderness in all 4 quadrants, and there is no exclusion of other diagnoses that could
> cause the claimant's symptoms.  The claimant's chronic pain syndrome was
> diagnosed by a physical therapist, who is not an acceptable medical source (Exhibit
> 20F).  Although these are not medically determinable impairments, I considered all
> of the claimant's subjective symptoms in evaluating her residual functional
> capacity.

Tr. 32.  The ALJ determined that Ms. Salazar's impairments did not meet or equal in severity

any of the listings described in the governing regulations, 20 CFR Part 404, Subpart P, Appendix

1.  Tr. 33.  Accordingly, the ALJ proceeded to step four and found that Ms. Salazar had the

residual functional capacity to perform light work as defined in 20 CFR §§ 404.1567(b) except that

> she can occasionally climb ramps and stairs, balance, and crawl; she can never climb ladders, ropes or scaffolds, or be exposed to unprotected heights or hazardous machinery; she can frequently reach with the left nondominant upper extremity; the work should be performed indoors, but she can walk outdoors for 5 minutes; and the noise level of the work environment should be moderate or less. From February 2021 to July 2022, she could perform work at the light exertional level; she could occasionally climb ramps and stairs, balance, crouch, kneel and crawl; she could never climb ladders, ropes or scaffolds, or be exposed to unprotected heights or hazardous machinery; she could frequently reach with the left upper extremity; she could occasionally use bilateral foot controls; the work should be performed indoors, but she can walk outdoors for 5 minutes; and the noise level of the work environment should be moderate or less. As of August 2022, she can additionally frequently finger and handle with the left non-dominant upper extremity.

Tr. 34-38. The ALJ determined that Ms. Salazar was capable of performing her past relevant work[5] and that Ms. Salazar, therefore, was not disabled. Tr. 38-39.

### A.     Relevant Medical Record Evidence Related to Ms. Salazar's Ability To Do Work-Related Physical Activities

#### 1.     Benjamin Buxton, M.D.

On November 22, 2019, Ms. Salazar presented to First Choice Community Healthcare, Benjamin Buxton, M.D., to establish care and with complaints concerning a "neck mass." Tr. 432-34. On physical exam, Dr. Buxton noted a "mobile firm mass palpable above notch of sternum." *Id.* Dr. Buxton urged Ms. Salazar to complete a CT scan within two weeks and present to the emergency room if she began experiencing airway obstruction.[6] *Id.*

---

[5] The ALJ determined that Ms. Salazar has past relevant work as a cashier (DOT No. 211-462-014, light with an SVP of 3), leasing agent (DOT No. 250.357-014, light with an SVP of 5), and leasing specialist (DOT 119-267-018, sedentary with an SVP of 7). Tr. 38.

[6] On December 11, 2019, Ms. Salazar had a CT Neck with contrast that revealed "[b]ulky palatine tonsils bilaterally, right greater than left probably reflecting tonsillitis. Underlying malignancy is felt to be less likely though not excluded." Tr. 437-39.

On January 2, 2020, Ms. Salazar returned to Dr. Buxton for follow up, lab results, and complaints of vomiting/nausea and bilateral shoulder pain.  Tr. 429-31.  On physical exam, Dr. Buxton noted left shoulder with some positions painful, full shoulder strength bilaterally, resolved tonsil enlargement, and "very tender left posterior neck muscles and left super trap c/w musculoskeletal pain."  *Id.*  Dr. Buxton assessed dyspepsia, instability of left shoulder joint, tobacco user, and posterior neck and back pain with features of fibromyalgia.  *Id.*  Dr. Buxton prescribed omeprazole and referred Ms. Salazar to orthopedics.[7]  *Id.*  Dr. Buxton planned to monitor Ms. Salazar's neck and back pain.  *Id.*

On February 13, 2020, Ms. Salazar returned to Dr. Buxton reporting chronic issues including shoulder pain and "other causes of pain," *i.e.,* pain in mid thoracic spine, lumbar spine, right hip, down leg, and bottom of feet.  Tr. 559-62.  Ms. Salazar also reported numbness in her

---

[7] On February 6, 2020, Ms. Salazar presented to Dustin Richter, M.D., UNM Department of Orthopaedics.  Tr. 499-500.  Dr. Richter reviewed imaging of Ms. Salazar's left shoulder and performed a "focused exam" of Ms. Salazar's left shoulder.  *Id.*  Dr. Richter assessed "left shoulder rotator cuff tendinitis and prior history of left acromioclavicular joint separation."  *Id.*  Dr. Richter noted that

> . . .  She has significant pain in her back, musculature, left shoulder.  We explained that her left shoulder acromioclavicular joint separation does not account for the constellation of her symptoms.  She likely has some rotator cuff tendinitis.  Giver her declining functional status as well as her global pain, we recommended a referral to physical therapy.  We recommend that she continue to follow with her primary care physician regarding her declining functional status and additional concerns.  We reassured her that we did not think that surgical intervention to her AC joint would significantly improve her pain.  If she fails to improve with physical therapy and anti-inflammatories, she can return to clinic.  We can consider an MRI at that time.

*Id.*

On February 18, 2020, Ms. Salazar presented for physical therapy evaluation of left shoulder pain based on Dr. Richter's referral.  Tr. 443-45.  Ms. Salazar rated her shoulder pain as 8/10.  *Id.*  DPT Michelle Salas assessed that

> Pt presents to PT with significant L shoulder pain, sensitivity to touch, soft tissue dysfunction, impaired shoulder AROM, abnormal posture, and positive RTC involvement.  These impairments are limiting the pt's ability to perform personal care, dress, sleep, reach overhead, carry, lift, drive, walk, and to participate in work and recreational activities.  Sxs are consistent with mechanical R shoulder pain 2/2 altered movement patterns with potential RTC involvement.  . . .

*Id.*  On July 15, 2020, Ms. Salazar self-discharged.  Tr. 702.

hands.  *Id.*  Dr. Buxton assessed new diagnoses of fibromyalgia, left shoulder tendonitis (stable),

and chronic headaches.[8]  *Id.*  Dr. Buxton encouraged regular exercise and prescribed

Amitriptyline.  *Id.*  Dr. Buxton noted that Ms. Salazar's posterior neck pain was stable.  *Id.*

      Ms. Salazar saw Dr. Buxton seven more times in 2020.  On March 23, 2020, Ms. Salazar

presented for, *inter alia*, follow up on pain which was intermittent.  Tr. 464-66.  On physical

exam Dr. Buxton noted that Ms. Salazar was moving all extremities equally, no gross deformity,

and normal gait.  *Id.*  Dr. Buxton noted that the Amitriptyline appeared to be effective for mood,

headaches, and fibromyalgia.  *Id.*  On April 8, 2020, *via* telehealth, Ms. Salazar reported left foot

pain following increased activity with yard work.  Tr. 462-63.  On April 27, 2020, *via* telehealth,

Ms. Salazar reported swelling of her left foot and knee pain and that the pain required use of a

walker.  Tr. 460-61.  Dr. Buxton noted it was "strange that [foot pain] would be bad enough to

require a walker" and suspected a very mild gout attack and/or flare of osteoarthritis.  *Id.*  He

ordered lab studies and prescribed a trial of Indomethacin.  *Id.*  On August 13, 2020, *via*

telehealth, Ms. Salazar reported "pain all over," falling "quite a few times," and not sleeping

very well.  Tr. 454-55.  Dr. Buxton discussed with Ms. Salazar the nature of fibromyalgia and the

need for good sleep, food, movement, and medication.  *Id.*  Dr. Buxton added Gabapentin.  *Id.*

On August 17, 2020, *via* telehealth, Ms. Salazar reported muscle spasms in her hands and feet.

Tr. 452-53.  Dr. Buxton prescribed Baclofen and encouraged drinking plenty of water and eating

bananas and oranges.  *Id.*

      Ms. Salazar next saw Dr. Buxton ten months later in 2021.  On June 3, 2021, Ms. Salazar

reported, *inter alia,* chronic pain.  Tr. 556-58.  Dr. Buxton assessed new back trigger points and

---

[8] This record does not reflect any physical exam notes.  Tr. 559-62.

pain related to fibromyalgia.[9] *Id.* Dr. Buxton discussed stretching and instructed Ms. Salazar to resume Baclofen. *Id.* On September 30, 2021, Ms. Salazar reported headaches following cessation of smoking and continued various pains in hips, feet, and hands. Tr. 553-54.

Ms. Salazar next saw Dr. Buxton twenty-one months later in 2023. On June 21, 2023, Ms. Salazar reported her pain overall had improved and that she was feeling much better. Tr. 740-42. Dr. Buxton assessed that Ms. Salazar's seronegative rheumatoid arthritis was improved and fibromyalgia was well controlled. *Id.* On July 17, 2023, Ms. Salazar reported that her feet were hurting, but that otherwise she was doing "OK" and that her overall body pains were much improved. Tr. 733-34. Dr. Buxton assessed that Ms. Salazar's seronegative rheumatoid arthritis and fibromyalgia were controlled. *Id.* On September 7, 2023, Dr. Buxton wrote a letter on Ms. Salazar's behalf as follows:

> I understand that this patient has applied for disability. You'll see from my clinic visit notes that she has experienced an unusually severe amount of chronic pain and discomfort over the past few years. She has improved somewhat since the peak of her symptoms, treating her as having seronegative rheumatoid arthritis, but she is still suffering significantly from this and fibromyalgia. She is on the optimal regimen for the time being. She certainly would not have been able to work over the past 2 years or more, and even now that symptoms are somewhat improved it's doubtful that she'd be able to focus on employment. She has had significant tenderness on examining her back and shoulders during past visits. Any assistance you can give her in her application for disability would be greatly appreciated.

Tr. 753.

### 2.    Victor R. Salgado, M.D.

On March 5, 2021, Ms. Salazar presented to consultative examiner Victor R. Salgado, M.D., for evaluation to determine possible disability benefits. Tr. 544-52. She reported disability due to fibromyalgia, thyroid disorder, kidney disease, migraines, pain in legs/feet and

---

[9] The record does not reflect any physical exam notes. Tr. 556-58.

neck, tendonitis, and chronic pain syndrome. *Id.* On physical exam, Dr. Salgado noted, *inter alia*,

> **Musculoskeletal**
>
> On examination, the claimant had preserved strength. 5/5 in all extremities. Decreased left shoulder abduction and flexion. She otherwise had full range of motion. Her sensation to light touch was intact throughout. The claimant was able to lift, carry and handle light objects. Claimant was able to squat and rise from that position with ease. Claimant was able to rise from a sitting position without assistance and had no difficulty getting up and down from the exam table. The claimant was able to walk on heels and toes. Tandem walking as normal, and claimant could hop on one foot bilaterally. Pain in hips, knees, and ankles on straight leg test.[10] No muscle spasms palpated. She has a slight antalgic gait without the use of an assistive device.

Tr. 547-48.

> Relevant to Ms. Salazar's pain, Dr. Salgado assessed as follows:

> **Fibromyalgia, Pain in legs feet, Chronic pain syndrome all over, pain in neck, tendonitis, chronic pain syndrome**: The claimant reports she has fibromyalgia and chronic pain syndrome. She has pain all over. A neurologist diagnosed her with fibromyalgia. The claimant reports she takes gabapentin, amitriptyline, and diclofenac gel. Reports the medications don't really help. States her pain was improved with indomethacin but her doctor stopped giving it to her. Exam: Cervical and thoracic spines tender to palpation, pain in hips, knees, and ankles on straight leg test. No muscle spasms palpated. 5/5 strength throughout, decreased left shoulder abduction and flexion to 120 degrees. She has a slight antalgic gait without the use of an assistive device.

Tr. 549.

> Dr. Salgado assessed *no functional limitations* in Ms. Salazar's ability to do work-related

physical activities. Tr. 550-51.

---

[10] Sitting and supine straight leg tests were negative. Tr. 549.

3.    **Stanley Z. Berman, M.D.**

On April 19, 2021, nonexamining State agency medical consultant Stanley Z. Berman

M.D., reviewed the medical evidence record at the initial level of review.[11]  Tr. 78-81.  Based on

his review, Dr.  Berman assessed that Ms. Salazar could occasionally lift and/or carry 20 pounds;

frequently lift and/or carry 10 pounds; could stand and/or walk for a total of about 6 hours in an

8 hour workday; could sit for a total of 6 hours in an 8 hour workday; could occasionally climb

ramps/stairs, balance, kneel, crouch, and crawl; could never climb ladders/ropes/scaffolds; has

limited left reaching in front, laterally and overhead; and should avoid concentrated exposure to

extreme cold and workplace hazards.  Tr. 78-79.

> Dr. Berman explained that
>
> Medical evidence shows abnormalities in knees, L shoulder, and cervical spine. Claimant reports trouble with using hands but CE did not show limitations with hands, claimant reported to CE vomiting was in the past and GI symptoms managed by medication, no evidence of one functional kidney and not taking medications [for] this, no abnormality with thyroid and no medications.  Therefore, claimant limited to this RFC.
>
> ANALYSIS:
>
> FR, PAIN Q, HA Q, 3P reasonably consistent w/each other.  Severity, as FR c/o dizzy, hands tremble, walk about 5 min, use/need AD for ambulation not supported by overall EOR.  Similar re FPCE ADLs, which note lift 5 lbs, walk 1 block.  FR notes no PC problem re Feed self/toilet; can do some HH chores, drives car, goes out once a day, shops in stores.  Similarly, MER does not support evidence of balance deficits nor use/need AD for ambulation.
>
> FPCE opinion of no limitations less than persuasive re Reaching: not supported by overall EOR nor FPCE, which noted decreased L shoulder ROM.  Single visit limitations appreciated.
>
> MER does not support listing level severity, including re HA hx.

---

[11] Dr. Berman reviewed radiology studies (CT neck, x-rays of left shoulder and knees), orthopedic treatment note regarding left shoulder, physical therapy notes, Dr. Buxton's primary care treatment notes to date, Dr. Salgado's consultative exam report, and Ms. Salazar's function report.  Tr. 80.

> MER does not support MDI w/severe impairment re work re kidney disease, thyroid disease.
>
> MER does support multiple MDIs, including multilevel C spine DDD; early b/l foot OA; mild b/l knee OA; hx bulky palatine tonsils b/l; TS noting "evidence of celiac disease" (UNMHSC, p. 13).
>
> MER supports TS consideration of gout, fibromyalgia; MDI more problematic.
>
> Appreciating pain, multiple MDIs, and obesity I, longitudinal and durational considerations, w/appropriate Rx compliance, overall EOR supports clmt physically capable of performing as noted on this RFC.

Tr. 81.

### 4.    Langford Sports & Physical Therapy

On July 11, 2022, Ms. Salazar presented to Langford Sports & Physical Therapy for evaluation of bilateral knee pain. Tr. 680-83. Ms. Salazar reported bilateral knee pain, osteoarthritis and neuromas in her right foot, and fibromyalgia diagnosis. *Id.* Ms. Salazar reported driving infrequently due to symptoms. *Id.* PT, DPT Francesca Picchi-Wilson assessed that Ms. Salazar's

> current impairments include muscle weakness, decreased neuromuscular control, decreased ROM of the R knee, neural tension, and abnormal gait. These impairments prevent her from performing pain free ADLs including tolerating walking distances greater than 100', squatting, and household chores. Signs and symptoms are consistent with knee OA. Comorbidities include R foot neuroma and fibromyalgia. At initial eval, pt had low tolerance for exercise due to knee pain, though motivated to improve her pain with exercise and is willing to try PT.

Tr. 681. Ms. Salazar attended three PT sessions on July 18, 2022, July 25, 2022, and August 1, 2022. Tr. 684, 685, 687. On July 18, DPT Picchi-Wilson noted that Ms. Salazar had improved tolerance to exercise compared to evaluation and that she reported improvement in pain in her hands with general exercise. Tr. 684. On July 25, DPT Picchi-Wilson noted improved 30 second sit to stand, up to 20 repetitions of double leg heel raises, and introduced lateral stepping and monster walks for glute activation and strengthening. Tr. 685. On August 1, 2022, DPT

Picchi-Wilson noted that Ms. Salazar had decreased tolerance to exercise overall due to higher level of pain and agitation.  Tr. 687.

### 5.    Karen Conner, PA-C

On October 4, 2022, Ms. Salazar presented to consultative examiner Karen Conner, PA-C, for evaluation to determine possible disability benefits.  Tr. 704-09.  Ms. Salazar alleged neck pain, back pain, shoulder pain (left greater than right) with limited range of motion, right foot pain, occasional falls due to poor balance with use of a walker at home, and muscle spasms.  *Id.*  Ms. Salazar reported she was able to perform activities of daily living that included bathing, dressing, eating, cooking, and cleaning.  *Id.*

On physical exam, PA-C Conner indicated, *inter alia*, that Ms. Salazar was in no acute distress, able to rise from waiting room chair independently, sat comfortably during exam, non-antalgic gait, able to walk on toes and heels, and did not use an assistive device.  *Id.*  PA-C Conner noted 4/5 throughout on strength exam of joints.  *Id.*  PA-Conner noted no deformity, tenderness, or swelling of Ms. Salazar's elbows, hands, wrists, and knees.  *Id.*  She noted no deformity or swelling of Ms. Salazar's shoulders, feet, and ankles.  *Id.*  She noted diffuse tenderness of deltoids bilaterally, diffusely tender plantar fascia bilaterally, and spinal tenderness T5-T10 with no paraspinal tenderness.  *Id.*  She noted negative straight leg raising bilaterally.  *Id.*

PA-C Conner found chronic pain multiple joints, limited range of motion of both shoulders, and ambulates well despite neuroma right foot.  *Id.*  PA-C Conner diagnosed chronic pain multiple joints, bilateral shoulder pain, neuroma right foot, and plantar fasciitis.  *Id.*  Based on her review of records,[12] reported history, and physical exam, PA-C Conner assessed that Ms. Salazar can occasionally lift up to 20 pounds; she can sit about 4 hours in an 8-hour

---

[12] PA-C Conner's report indicates, without more, that she reviewed a "PT consult," and PCP notes.  Tr. 704.

workday; she can stand/walk less than 2 hours in an 8-hour workday; she can occasionally reach, grasp, bend and stoop; she can frequently handle and feel; she can never kneel; and she occasionally uses a walker. *Id.*

### 6.    Judy Kleppel, M.D.

On January 9, 2023, nonexamining State agency medical consultant Judy Kleppel, M.D., reviewed the medical evidence record at reconsideration. Tr. 102-07, 122-26. Based on her review, Dr. Kleppel assessed that Ms. Salazar could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; could stand and/or walk for a total of about 6 hours in an 8 hour workday; could sit for a total of 6 hours in an 8 hour workday; could occasionally climb ramps/stairs, balance, stoop, kneel, and crouch; could never crawl or climb ladders/ropes/scaffolds; has limited left reaching in any direction; and should avoid even moderate exposure to workplace hazards. *Id.*

### 7.    Lovelace Rehabilitation Hospital

On February 10, 2023, Ms. Salazar presented to Lovelace Rehabilitation Hospital for a physical therapy evaluation. Tr. 853-66. Ms. Salazar reported diagnoses of chronic pain and fibromyalgia and that she was referred specifically for aquatic physical therapy. *Id.* Ms. Salazar reported full body pain and difficulty completing her activities of daily living due to increased pain when standing, sitting, or ambulating for "too long." *Id.* Ms. Salazar reported her current pain level at 8/10. *Id.* PT Lindsey Borders noted that Ms. Salazar demonstrated overall decreased strength and decreased gait speed, that she required multiple rest breaks while testing, and reported high levels of pain. *Id.* PT Borders also noted that Ms. Salazar had good rehabilitation potential to decrease her symptoms and improve her deficits with skilled physical therapy intervention. *Id.*

14

Subsequent physical therapy notes are dated from May 3, 2023, through September 1,
2023.  Tr. 760-850.  They include eleven treatment notes and two re-evaluations.  *Id.*  On
September 18, 2023, Ms. Salazar was discharged due to inability to obtain additional insurance
authorization.  Tr. 760-61.  Throughout this physical therapy, Ms. Salazar reported pain related
to her feet, knees, left wrist, and shoulders and generally rated her overall pain as 7, 8 or 9/10.[13]
Tr. 760-850.  Therapist notes indicated that Ms. Salazar tolerated therapy well and that it was
helpful for relieving her pain.  *Id.*

    **B.**    <u>**Arguments**</u>

        **1.**    <u>**The ALJ Considered All of the Evidence Related to
Ms. Salazar's Impairments and Related Pain**</u>

In support of her Motion, Ms. Salazar first argues that the ALJ failed to meaningfully
consider Ms. Salazar's frequent reports of high pain levels to her physicians and findings
contained in physical therapy records when evaluating her symptom allegations and formulating
the RFC.  Doc. 15 at 18-20.  Specifically, Ms. Salazar argues that the ALJ's conclusion that her
pain was reasonably well controlled and stable with medications and treatment contradicts
substantial longitudinal evidence.  *Id.*  Ms. Salazar argues that the ALJ's statement that she
"benefited from [aquatic] physical therapy [in 2023] with improved mobility and strength and
reduced pain" is insufficient to demonstrate meaningful consideration of her aquatic physical
therapy records.  *Id.*  And Ms. Salazar argues that the ALJ incorrectly stated that she had no
spinal or joint abnormalities necessitating surgical intervention.  *Id.*  In support, Ms. Salazar cites
three physical therapy treatment notes from July/August 2022 that include objective findings of
reduced shoulder range of motion and strength, abnormal gait, positive straight leg raising test,

---

[13] At her initial evaluation, Ms. Salazar reported that her pain at its worst was "20+/10."  Tr. 855.

pain with squatting, and abnormal sit/stand repetitions. *Id.* Ms. Salazar also cites her subjective

pain ratings while participating in aquatic physical therapy from May 2023 through September

2023. *Id.* Finally, she cites a July 8, 2023, ambulatory referral to orthopedics as evidence of

requiring surgical intervention. *Id.* Ms. Salazar argues that these records are substantial

evidence related to her pain that the ALJ failed to meaningfully consider and demonstrate the

significant measures she has undergone to relieve her pain.[14] *Id.*

The Commissioner contends the ALJ summarized and discussed Ms. Salazar's treatment

records, considered both positive and negative findings, evaluated the conflicting medical

opinion evidence, and ultimately reconciled the evidence finding Ms. Salazar had greater

functional ability than opined by some and less functional ability than opined by others. Doc. 16

at 8-18. The Commissioner contends that the ALJ considered Ms. Salazar's subjective

symptoms by explicitly stating that she considered "the entire record" and "all symptoms," and

by formulating a highly restrictive RFC. *Id.* The Commissioner further contends that

Ms. Salazar has mischaracterized the legal standard by which an ALJ must consider and discuss

evidence, *i.e,* by inserting the qualifier "meaningfully" before the word "consider" and by

claiming per se error for not discussing certain pieces of evidence. *Id.* In sum, the

Commissioner contends that Ms. Salazar is plainly asking the Court to reweigh the evidence

which the Court should reject. *Id.*

The Tenth Circuit has held that "[t]he record must demonstrate that the ALJ considered

all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Clifton*, 79

F.3d at 1009-10. In addition, the ALJ should not ignore relevant evidence or mischaracterize the

---

[14] Ms. Salazar likens her situation to that found in *Donna R. v. Kijakazi*, USDC NM Civ. No. 20-1116 SCY, in which the Court remanded having found that the ALJ failed to acknowledge, *inter alia*, the claimant's complaints of longitudinal hip pain. Doc. 15 at 19; Doc. 19 at 3-4. *See* fn. 20, *infra*.

evidence. *Id.* at 1010. ("Rather, in addition to discussing the evidence supporting his decision, the ALJ also much discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."). SSR 16-3p defines the two-step process an ALJ must use when evaluating a claimant's symptoms. *See* SSR 16-3p, 2017 WL 5180304. At the first step, the ALJ "consider[s] whether there is an underlying medically determinable physical or mental impairment[ ] that could reasonably be expected to produce [the] individual's symptoms such as pain." *Id.* at *3. At the second step, after the ALJ has found such an impairment, the ALJ "evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the] individual's ability to perform work-related activities...." *Id.* The ALJ considers the record evidence, the claimant's statements, the medical and non-medical source statements, and a non-exhaustive list of factors provided in 20 C.F.R. § 404.1529(c)(3).[15]

Because the burden is on the claimant to point to probative evidence the ALJ ignored, *Mays v. Colvin*, 739 F.3d 569, 575-76 (10th Cir. 2014), the Court considers the evidence Ms. Salazar cites. Ms. Salazar first cites three physical therapy treatment notes from a two-week period of time in July/August 2022 as evidence of significant functional limitations that the ALJ failed to consider.[16] Ms. Salazar argues these physical therapy treatment notes indicate reduced shoulder range of motion and strength, abnormal gait, positive straight leg raising test, pain with

---

[15] These include (1) Daily activities; (2) The location, duration, frequency, and intensity of pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (*e.g.,* lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2017 WL 5180304, at *7-8.

[16] The Administrative Record contains records from November 2019 through September 2023. These three physical records are the only treatment records in 2022.

squatting, and abnormal sit/stand repetitions.  Ms. Salazar is correct that the ALJ did not specifically discuss these three physical therapy records.  However, Ms. Salazar fails to show that the treatment note findings represent either uncontroverted evidence the ALJ chose not to rely upon, or significantly probative evidence the ALJ rejected.  For instance, the ALJ determined at step three that left shoulder degenerative joint disease and bilateral knee osteoarthritis were medically determinable impairments.  Tr. 33.  At step four, the ALJ restricted Ms. Salazar to light exertional work, with additional postural, manipulative, and environmental limitations related to Ms. Salazar's medically determinable impairments and related pain. Tr. 33-34.  The ALJ discussed physical examinations and opinion evidence that demonstrated Ms. Salazar had "mildly reduced left shoulder range of motion," "decreased left shoulder range of motion," "able to squat and rise with ease," and "physical . . . examinations . . . generally within normal limits."[17]  Tr. 35-36.  The record supports these findings.  *See* Section III.A., *supra*.  Ms. Salazar argues that the physical therapy treatment notes indicated abnormal gait and a positive straight leg raising test that the ALJ failed to consider.  Doc. 15 at 19.  Yet the ALJ discussed physical exam findings from the medical evidence record showing both normal and slightly antalgic gait without the use of an assistive device and negative straight leg raising tests.[18]  Doc. 35-36.  The record supports these findings.  *See* Section III.A., *supra*.  Last,

---

[17] The ALJ specifically referenced consultative examiner physical exam notes from 2021 and 2022, Exhibit 9F (Dr. Salgado) and Exhibit 15F (PA-C Conner), indicating 5/5 joint strength with decreased left shoulder abduction and flexion to 120 degrees, able to squat and rise from position with ease, able to rise from sitting without assistance, able to walk on heels and toes, able to hop on one foot bilaterally (Tr. 549); and 4/5 joint strength throughout, full range of motion of knees and limited range of motion of both shoulders, able to walk on toes and heels (Tr. 708).  Tr. 36; *see S*ection III.A.2 and 5, *supra*.

[18] The ALJ specifically referenced consultative examiner physical exam notes from 2021 and 2022, Exhibit 9F (Dr. Salgado) and Exhibit 15F (PA-C Conner), indicating slight antalgic gait without the use of an assistive device, negative sitting and supine straight leg raising tests (Tr. 546, 549); and normal base of support, non-antalgic gait, does not walk with assistive device, negative straight leg raising test bilaterally (Tr. 706, 708).  Tr. 36; *see S*ection III.A.2 and 5, *supra*.

Ms. Salazar argues the physical therapy notes indicated she had pain with squatting and abnormal sit/stand test.  Doc. 15 at 19.  The ALJ, however, discussed physical exam findings showing Ms. Salazar had the ability to squat and rise with ease, tandem walk, hop on one foot bilaterally, and normal strength.  Tr. 35-36.  The record supports these findings.  *See* Section III.A., *supra*.  Ms. Salazar, therefore, has failed to show that these three physical therapy records, although not specifically discussed, contain uncontroverted or probative evidence related to her medically determinable impairments and related pain that the ALJ overlooked or failed to otherwise show she considered in assessing Ms. Salazar's ability to do work-related physical activities.

Ms. Salazar next argues that she reported subjective pain ratings of 7, 8 or 9/10 while attending aquatic physical therapy for four months in 2023 and that the ALJ's conclusory statement that she "benefited from [aquatic] physical therapy with improved mobility and strength and reduced pain" fails to demonstrate meaningful consideration of these records or to account for Ms. Salazar's subjective pain ratings despite obtaining some relief.  While Ms. Salazar correctly cites her subjective pain ratings as reported, she has not demonstrated that the ALJ's silence with respect to these ratings amounts to a failure to consider these records at all or that the records contain uncontroverted evidence the ALJ failed to discuss or probative evidence she rejected.  To the contrary, the ALJ's statement that Ms. Salazar benefited from the aquatic physical therapy with reduced pain, which Ms. Salazar concedes, is supported by the record and demonstrates the ALJ did not ignore this evidence.  *See* Section III.A.7, *supra*.

Finally, the Court finds that Ms. Salazar's argument that the ALJ incorrectly stated that diagnostic testing has not shown severe spinal or joint abnormalities necessitating surgical intervention is without merit.  In support, Ms. Salazar cites a July 8, 2023, emergency

department record when she presented after a fall and injuring her feet. Tr. 713-20. Radiologic studies indicated an impacted fracture of her right fifth toe with no significant displacement, no dislocation, well-maintained joint space, and soft tissue swelling. *Id.* The emergency department provider noted she placed Ms. Salazar in a surgical boot and ordered an ambulatory referral to orthopedics for follow up. *Id.* Nine days later, on July 17, 2023, Ms. Salazar reported to Dr. Buxton her feet were hurting, but she was otherwise okay. Tr. 733. Having not yet received a follow-up call from orthopedics, Ms. Salazar sought an orthopedic referral from Dr. Buxton "to see when she can come out of rigid shoe given to her by ER." *Id.* On July 26, 2023, Ms. Salazar reported to PT Borders that she had been cleared to not wear the walking boot as tolerated. *Id.* Based on the foregoing sequence of events, the Court is not persuaded that the emergency department provider's ambulatory referral to orthopedics supports Ms. Salazar's argument that the ALJ incorrectly stated that diagnostic testing has not shown several spine and/or joint abnormalities necessitating surgical intervention.

In sum, the Court finds that Ms. Salazar has not established that the ALJ failed to consider relevant, uncontroverted, probative, or longitudinal evidence in assessing her ability to do work-related physical activities.[19] Moreover, the ALJ addressed Ms. Salazar's statements

---

[19] Ms. Salazar relies heavily on *Donna R. v. Kijakazi*, 2022 WL 594883 (D.N.M. Feb. 28, 2022). In that case, the claimant argued, *inter alia*, that the ALJ did not fully credit claimant's assertions of limitations from degenerative joint disease of the right hip and osteopenia in assigning an RFC for medium work. *Id.* at *3. The Court agreed that the ALJ overlooked or failed to otherwise show that he considered probative, relevant, and longitudinal evidence related to claimant's complaints of hip-related pain when assessing claimant's ability to perform physical work-related activities. *Id.* at *3-4. The Court also found that the ALJ failed to discuss and evaluate the claimant's subjective symptom evidence pertaining to knee and leg pain. *Id.* at *5. The Court also found that the ALJ failed to discuss limitations based on claimant's upper extremity pain resulting from breast cancer surgeries. *Id.* at *6.

That is not the case here. While Ms. Salazar correctly argues that the ALJ did not discuss three physical therapy notes from July/August 2022 and did not note her subjective pain ratings during physical therapy in 2023, Ms. Salazar has not shown that the ALJ overlooked or otherwise failed to consider probative or uncontroverted evidence related to her medically determinable impairments and related pain from her alleged onset date of November 8, 2019, through September 18, 2023 (the most recent record contained in the Administrative Record).

related to pain throughout her determination and compared it to the medical evidence record as she was required to do.  Tr. 35-38.  Here, the ALJ determined that Ms. Salazar's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, but that Ms. Salazar's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  Tr. 35.  Relevant to SSR 16-3p, the ALJ explicitly discussed Ms. Salazar's hearing testimony and reported functional limitations related to her pain.  Tr. 34.  The ALJ cited medical record and opinion evidence, including diagnostics and physical exams.  Tr. 35-38,  The ALJ discussed Ms. Salazar's daily activities and her stated ability to care for her personal needs, attend appointments and physical therapy, cook, clean, drive a car, go shopping, handle finances, sew, crochet, and interact with others.  Tr. 37.  The ALJ discussed that Ms. Salazar's pain has been reasonably controlled and stable with medications and treatment and that consultative examinations demonstrated "normal strength, gait, station, coordination, and sensation with no significant neurological abnormalities.  She also had normal bilateral grip strength and hand and wrist functioning."  Tr. 36.  The record supports these findings.  *See* Section III.A., *supra.*

In sum, while the physical therapy records and subjective pain ratings Ms. Salazar cites support her alleged symptom of pain, they do not present uncontroverted or probative evidence the ALJ failed to consider or rejected, nor do they overwhelm the medical record evidence the ALJ considered and discussed in assessing Ms. Salazar's ability to do work-related physical activities.  Thus, without reweighing the evidence, the Court finds that the ALJ applied the correct legal standards in considering the evidence and evaluating Ms. Salazar's symptoms related to pain.

2.    **The ALJ Applied the Correct Legal Standards In Evaluating PA-C Conner's Opinion Evidence**

Ms. Salazar next argues that the ALJ failed to meaningfully consider the objective evidence throughout the record that is consistent with, and supportive of, consultative examiner PA-C Conner's standing and walking restrictions, which are greater than the ALJ assessed in her RFC. Doc. 15 at 20-22. Ms. Salazar argues that the ALJ's rationale for finding PA-C Conner's opinion was inconsistent with other medical evidence was conclusory and that the ALJ failed to cite any medical evidence to support it rendering her decision beyond review. *Id.* Ms. Salazar reiterates that there is considerable evidence that she presented to healthcare providers with abnormal gait, positive straight leg raising, and pain related to walking and squatting, all of which plainly support PA-C Conner's assessed limitations with standing and walking. *Id.* Ms. Salazar argues that the ALJ's error is especially prejudicial and harmful because, pursuant to Administration guidelines, she would have been disabled as a matter of law had she been limited to less than a full range of sedentary work. *Id.*

The Commissioner contends that the ALJ applied the correct legal standards when assessing the medical opinion evidence and that her factual findings were supported by more evidence in the record than required under the substantial evidence standard of review applicable here. Doc. 16 at 18-22. The Commissioner contends that Ms. Salazar misinterprets the ALJ's findings by suggesting she determined that the evidence did not support any standing or walking limitations when the ALJ clearly found Ms. Salazar was limited to light work. *Id.* The Commissioner contends that the ALJ found that the standing and walking restrictions PA-C Conner opined were not supported by her own examination. *Id.* The Commissioner contends that Ms. Salazar's arguments related to the ALJ's discussion on inconsistency ignore that the ALJ previously discussed the medical evidence of record and is not required to repeat that

discussion when evaluating the opinion evidence.  *Id.*  The Commissioner reasserts that Ms. Salazar is asking this Court to improperly reweigh the evidence, which it cannot do.  *Id.*

An ALJ evaluates the persuasiveness of medical opinions based on: (1) the degree to which the opinion is supported by objective medical evidence and supporting explanation; (2) how consistent the opinion is with other evidence in the record; (3) the source's treating relationship with the claimant (i.e., how long/frequently the source treated the claimant and for what purpose); (4) whether the source was specialized on the impairment on which he or she is opining; and (5) any other factor tending to support or contradict the opinion.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are "supportability ... and consistency."  20 C.F.R. §§ 404.1520c(a).  The factor of supportability "examines how closely connected a medical opinion is to the evidence and the medical source's explanations: 'The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s), the more persuasive the medical opinions will be.' "  *See Zhu v. Comm'r, SSA*, No. 20-3180, 2021 WL 2794533, at *5 & n.8 (10th Cir. July 6, 2021). (internal brackets and ellipsis omitted) (quoting, *inter alia*, 20 C.F.R. § 404.1520c(c)(1)). Consistency, by contrast, "compares a medical opinion to the evidence: 'The more consistent a medical opinion(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) will be.' "  *Id.* (internal ellipsis omitted) (quoting, *inter alia*, 20 C.F.R. § 404.1520c(c)(2)).  The SSA does not give "any specific evidentiary weight, including controlling weight, to any medical opinion(s)."  20 C.F.R. §§ 404.1520c(a).

When evaluating the supportability and consistency of a medical source's opinions, "all the ALJ's required findings must be supported by substantial evidence, and he must consider all

relevant medical evidence in making those findings." *Lobato v. Kijakazi*, 2022 WL 500395, at

*11 (D.N.M. Feb. 18, 2022) (quoting *Grogan*, 399 F.3d at 1262).  The ALJ also cannot "pick

and choose among medical reports," using only portions of evidence that are favorable to his

position and disregarding those that are not.  *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir.

2004).  This requirement, though, does not mean that the ALJ must discuss every piece of

controverted evidence.  *See Clifton*, 79 F.3d at 1009-10.  Rather, it merely requires the ALJ to

show that he considered evidence unfavorable to his findings before making them.  *See id.* at

1010.  Further, the Commissioner may not rationalize the ALJ's decision post hoc, and

"[j]udicial review is limited to the reasons stated in the ALJ's decision."  *Carpenter v. Astrue*,

537 F.3d 1264, 1267 (10th Cir. 2008) (citation omitted).

Here, Ms. Salazar correctly notes that in the three paragraphs the ALJ evaluated PA-C

Conner's assessed limitations and the objective findings in her report (Tr. 37-38), the ALJ stated

as to certain assessed limitations, without more, that they were inconsistent with other medical

evidence of record.  Ms. Salazar argues the ALJ's statement of inconsistency failed to include

any reference to other medical evidence and, therefore, renders the ALJ's rationale beyond

meaningful review.  This argument, however, ignores that the ALJ summarized and discussed

the medical record and opinion evidence throughout her determination such that reading it as a

whole makes clear the ALJ's reasoning.[20]  *See generally Webb v. Comm'r. Soc. Sec. Admin.*, 750

---

[20] For instance, the Administrative Record contains three other medical opinions related to Ms. Salazar's ability to do work-related physical activities, all of which the ALJ evaluated and discussed and none of which assessed greater standing and/or walking limitations than the ALJ assessed in her RFC.  On March 5, 2021, consultative examiner Victor Salgado, M.D., assessed that Ms. Salazar had *no functional limitations* based on her alleged impairments.  Tr. 544-52.  The ALJ found this opinion not persuasive based on Ms. Salazar's medically determinable impairments which supported exertional limitations.  Tr. 37.  On April 19, 2021, nonexamining medical consultant Stanley Z. Berman, M.D., found that Ms. Salazar could perform light exertional work with certain postural, manipulation, and environmental limitations.  Tr. 78-81, 86-89.  The ALJ found this opinion mostly persuasive.  Tr. 37.  On January 9, 2023, nonexamining medical consultant Judy Kleppel, M.D., assessed that Ms. Salazar could perform light exertional work, with certain postural, manipulation, and environmental limitations.  Tr. 102-07, 122-26.  The ALJ found this

F. App'x 718, 721 (10th Cir. 2018) (finding ALJ's general reference to medical records discussed earlier in decision provided basis for determining inconsistencies the ALJ relied upon in weighing opinion evidence). Moreover, the Court has previously addressed and rejected Ms. Salazar's argument that the physical therapy records from July/August 2022 contain evidence of functional limitations the ALJ overlooked or failed to consider in assessing her RFC. *See* Section III.B.1., *supra*.

That aside, in addition to finding that certain limitations PA-C Conner assessed were inconsistent with other medical evidence of record, the ALJ also found PA-C Conner's assessment partially persuasive because it was not supported by PA-C Conner's *exam*. Tr. 37-38. For instance, she found PA-C Conner's assessment of decreased walking and standing and never kneeling were not supported by PC-A Conner's physical exam which demonstrated normal gait, station, and coordination without the use of an assistive device, and that Ms. Salazar was able to sit comfortably and arise from a chair independently. *Id.* The ALJ also found that PA-C Conner's assessment limiting Ms. Salazar's ability to handle with her right hand was not supported because Ms. Salazar's de Quervain's syndrome was limited to her left hand. *Id.* Finally, the ALJ found that PA-C Conner's assessment limiting Ms. Salazar to occasional reaching was not supported based on "mildly limited shoulder range of motion and tenderness." *Id.* The record supports these findings. *See* Section III.A.5., *supra*.

---

opinion mostly persuasive. Tr. 37. Ms. Salazar has not raised any issue with respect to the ALJ's evaluation of this medical opinion evidence.

Additionally, following her discussion and evaluation of the medical opinion evidence and "[b]ased on the entire record," the ALJ explicitly stated that the RFC she assessed was "supported by the medical evidence of record, two consultative medical evaluations, expert opinion evidence, and the claimant's activities." Tr. 38.

Ms. Salazar nonetheless challenges the ALJ's evaluation arguing PA-C Conner's assessment was based on more than just her exam, *i.e.,* her review of certain records.[21]  In doing so, however, Ms. Salazar does not point to anything in PA-C Conner's report that the ALJ allegedly ignored and/or should have considered wherein PA-C Conner specifically identified or explained how the records she reviewed supported her assessed functional limitations.  The Court, therefore, finds no error in the ALJ's evaluation of PA-C Conner's assessment with the objective medical evidence in the report as she was required to do.

In sum, the Court finds that the ALJ applied the correct legal standards in evaluating PA-C Conner's opinion and that her reasons for finding it partially persuasive are supported by substantial evidence.

## IV.  Recommendation

For all of the reasons stated above, the Court finds that Ms. Salazar's Motion is not well taken.  The Court, therefore, recommends that the Motion be **DENIED.**

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**

---

[21] *See* fn. 12, *supra.*